Good morning, Your Honors. My name is Sean O'Brien. I represent the appellants, Jaya Marie Little and her grandmother, Marie Toomer. I would like to reserve three minutes for a reply. Briefs, I believe, extensively went into the law that applies to this case. The two key cases are the Morris v. De La Torre case and the Delgado v. Trax Bar and Grill case. Those were both decided in 2005 and were declaratory of existing law in California for the time period in which the events in this case happened. In terms of the way the Court describes the law in Delgado, it talks about what's called regular foreseeability. Under regular foreseeability, there is enough factual evidence in this case for the lower court's decision to be reversed. Counsel, the possible problem with your argument is that it might be foreseeable that once they left the cafe or whatever it was and went across the street onto property that was not under control of the government, there had been some violence over there. But is there an obligation on the part of the government to provide protection off its own property? Yes, if the negligence occurs on the government's property. In this case, it did. The failure to call 9-1-1 and the duty to call 9-1-1 happened at the gate on the base while the perpetrators of the eventual murder were still on the base. So the negligence which ended up causing the harm happens on the government's property. The California Supreme Court has held and I believe it's the NN case, it's one of them, I think at page 676, that where something starts at a certain place and moves to another place, whether it be a landlord tenant situation or, in this case, a car situation, that fact that it happens at a different place, the harm, does not prevent liability from being imposed. That is also the rule of law in cases involving warnings. Particularly notable cases there were the Tarasov and Jablonsky cases where the doctors learned in their offices that threats were being made against patients and potential victims. The harm itself was carried out outside the doctor's offices and they could still be held liable because the duty that arose was the duty to warn. The duty in this case to call 9-1-1. And what would they have said to 9-1-1? They would have reported that there was a murder threat and that the person making the threat had gone on a route that would have taken them to the known hangout after the club vento closed, the Del Tago. And if they, as I've argued in the brief, had done their work concerning the threat outside the bar, they would have known that the persons those persons were talking about, who they were going to murder, were the persons they had been fighting with earlier. And the fight had been broken up by the security personnel on the base. What would they have said though? Because I thought that they were unable to see the license plate or identify the individual. They heard something but what would they say? We heard something bad but we don't have any idea who the perpetrator was or anything? Well, as I argued in the brief, they identified the car at the criminal trial. So they knew what the car looked like. It was a black Nissan with shiny rims. They also knew that they had checked it in earlier that night. And they had, and I've produced in the record, a picture of the decals on the front window of the car. So they had that much identifying information. And they knew the probable place that they were going. Then, had they identified these persons during the fight outside the bar, they would have had the names of the persons. But they did not do that. That was an additional part of the negligence involved that contributed to the ultimate harm. But at the very least, they could have given them the information that there were four African American males of a young 20 to 22 age in the car with shiny rims with military decals on it heading for this Del Taco restaurant, which is right across from the base. That much they could have given them. According to my expert, who is a 24-year San Diego Police Department sergeant, that would have been enough for him to interpose himself into the situation to prevent violence. Well, how did the guard at the gate, how did he know, how would he know that the person who passed through and made a threat was going to carry out the deed at Del Taco? Well, as far as the first part of it, he testified that he took the threat as real. Both of them said that they put their hands on their weapons. They felt the threat was real. In terms of specifically identifying the Del Taco, the information they could have provided was that it was the local hangout after the club and that the direction the car took, and I believe it was Officer Gordon who testified to this, was down the Harbor Boulevard going to the right to the Del Taco as the direction the car left. That information they could have given, along with the description of the car, the description of the driveway. Well, how far outside the main gate was the Del Taco? The main gate, I don't have the exact distance. A particular post on the base, post 15, it is directly across the street from that post. That was the post that first heard the shots. That was the post that called in the shots when they were heard. But no, the distance between the guard that you're now describing should have called 911 in your view. How far was that person from the restaurant? To be honest with you, I did not do the measurement. The best description I can give to you is that you go down one street and you take a right, and it's right up... So the guard couldn't actually see the restaurant from where they were? No. So just, all they could have said is they turned right and left. And they could have told them because they knew, and they testified to this, that this was the most probable place they were going to go because that was the after hours club metro hanging up. And that information could have been provided. But they didn't go there right away. They did go there right away. They left in the middle of it, but they went there right away. The persons that eventually did the shooting. Where did they get that AK? Well, that's the other part of this case, Your Honor. The theory which the lower court I believe just ignored, and I believe it should be reversed on the ground also, is Mr. Thomas' de facto landlord was his sergeant, Sergeant Sanders. Thomas went back to Sanders' apartment, took the gun out of the apartment. Sanders realized he had taken the gun out of the apartment, called him, that is called Thomas, but also did not call the police, did not report that an AK-47 had been taken out of his apartment with a person he knew had intent of using it because he had experience with them in the past. That may be a long answer to your question, but it was out of Sanders' heart. How would the sergeant know that Thomas was going to commit murder with an AK-47? Well, Thomas had been pacing up and down in the apartment saying that he had been disrespected, that he had used rather foul language in describing what he felt he had been treated like, and that he was going back to get the people that had disrespected him. And so how did the sergeant know that he walked off with the sergeant's AK-47? Well, it was in, from the testimony it indicates it was in the sergeant's bedroom. Now, the sergeant was apparently asleep and then woke up. There was this other guest staying there, his nickname is Dinky, I believe it's Kenneth Wortham, that also learned that Thomas had come and taken the gun out of the apartment. And we have telephone calls from Sanders before Thomas gets back to the Delcataco in which, paraphrasing, Sanders is begging him to come back to the apartment because he's afraid that he's going to use the gun. What did he, what did, what did the, what did your client say when he drove through the gate? What did Thomas say when he drove through the gate? We're going to do a 187. And the guards recognized that as a murder threat. The 187 being the penal code for murder in California. What? 187 is the penal code statute for murder in California. Yes. But they recognized that use of that term as a murder threat. There's no doubt in either of their testimonies, both guards, Salazar and Gordon, that they understood that was a threat. So, um, what was the government's duty here? First prong of the duty is to call 9-1-1. And that arises. Call what? 9-1-1. Call the police. The minimal duty that the Morris v. Delatorre case imposes on businesses in California. When you see a patron that's been threatened or there's an imminent threat per patron, as in this case, you call 9-1-1. You're alert to police. Did the guards at the post, did they know they'd been a big fight over to Metro Club? They should have known, Your Honor. The entire base security was connected by walkie-talkie radios, and they were, according to their supervisors, required to listen while things are going on on the base. And that makes some logical sense also. So had they been listening in on the walkie-talkies, they would have heard about the fight being broken up in the parking lot. Was there any testimony that they in fact were listening? There was testimony, I believe, by Officer Gordon that he kept his radio on. There was no testimony that they recognized that the fight had occurred and it was coming toward them. That is, the participants. In fact, one of the opinions rendered by one of my experts was that the security personnel who had broken up the fight in the parking lot should have radioed ahead and should have told the guards at the gate, look, these guys have not stopped fighting. They're coming toward you. Be alert. That didn't happen. That's another piece of the negligence, in this case, of omission. Well, when the security people came there to break up the fight, did they arrest anyone? They did not arrest anyone and they did not identify anyone. They interposed their bodies in between the participants that were using profanity and using violent words against each other. That's the way they talk. Well, the security guard, I believe it was Hargraves, testified that he thought violence was imminent. It was what? Imminent. I'm sorry, I have a bit of a cold. Not imminent. Imminent. Yes, sir. So he thought violence was imminent by the way they were talking the loudest. It wasn't just joking using the N word or joking using the F word. It was angry using those words. So that's what led him to that conclusion. And then, I don't know if I finished answering your question. Did he break it up? Did he tell them to get off the base? They told everybody to disperse and then they witnessed the fact that they didn't disperse. They witnessed this guy, Henderson, drive his car back around to where they were told that they were supposed to leave and they witnessed this guy, Thomas, the shooter, being dragged back to his car by his group because he wanted to continue the fight. So that was the status as they were heading toward the gate and they did not again call ahead and say to the guards, these people are coming toward you. You're pretty much over your time counselor. I apologize. Did they all go through the gate? Pardon? Did they all go through the gate? The entire Thomas group, as I called it, went through the gate in the car. My client's deceased father and son walked out of the base. Sorry for exceeding my time. And his father was there with him? No, my, Diane Marie Little is my client. She was the daughter of the father. Oh, okay. All right. Good morning, Your Honors. It's Steve Shew on behalf of the United States. Why don't you want to unbutton the first button? I've been told that it's the top two, Your Honor. I've been told to use the top one unbuttoned. Your Honors, this bottom line here is that the shooting was an extreme form of criminal conduct that had no basis, no warning that would have allowed the United States to predict that it was forthcoming. Your Honors, to focus on a series of events, we're really looking at three series of events during the course of the night. Let me ask you a question. When the guy goes through and he's yelling and hollering or whatever he was doing there with the guard at the gate, what did he say about a 187? That's correct, Your Honor. What did he say? He said we're going to do a 187. We're going to do a 187? Correct. That tells you he's going to commit a violation of California Penal Code 187. Well, if we look at that comment in the light most favorable to our plans below, at best what we have is someone driving past security guards as they're leaving the base saying, I'm going to kill somebody. I'm going to kill somebody, so then this is a big base. They've got patrol vehicles there and everything. They had a picture of the vehicle and usually they have a patrol car right by the that post. They could have sent that car out, give a description, told them what the make was. Well, here all we have is this one isolated comment, I'm going to kill somebody in the light most favorable. You have no identification of who the intended victim is. You don't know exactly who is saying this, where they're going to do this, when they're going to do this. Well, but they know there was a big fight going on at the Metro. Well, for Your Honor, it wasn't even a big argument, one that was very common following the closing of Club Metro at 1.30 in the morning. What you have is a number of people that have been consuming alcohol during the course of the night. You have a lot of trash talking in the parking lot, people just saying, hey, I'm tougher than you or I'm going to mess you up. Those were the type of comments that were overheard by base security when they saw these two groups yelling at each other. The security guards then interposed... Who runs the Metro Club? It's run by the Navy, Your Honor. By the Navy? MWR, correct. They let these sailors and Marines in there and get all drunk and noisy and all that. Well, MWR's mission, as you may be aware, Your Honor, is morale, welfare, and recreation to provide entertainment for the service members. This was a club night where they had music, they had dancing. It was a recreational night for service members. Was the shore patrol there? That's correct, Your Honor. Shore patrol was present in white uniforms by the doors and along the walls. And billy sticks and .45. The shore patrol were not carrying firearms, but there were bouncers that also had clubs, etc. And you also had base security all throughout the base. They would conduct roving patrols here and there inside the club and also outside. The record indicates that there was... But the shore patrol must have known these people. There's no evidence in the record that any of the base security or shore patrol people actually knew personally any of the people that were involved in any of these, the arguments that took place that eventually, that arguably, as Planet Planet has asserted, formed the basis for the ultimate violence. The evidence at the gig, we look at the gig for a moment when the 187 comment was heard. We have two base security guards who were there directing traffic off the base. As Your Honor has pointed out, there was no identification of the vehicle. All they knew was that it was a dark vehicle with shiny rims. They did not see the license plate. They didn't know who the intended victim was. They didn't know where they were going. Did they have a picture of the vehicle when it entered? I'm sorry, Your Honor? I thought they had a picture of the vehicle when it entered. You're asking if base security took a picture of the vehicle as it entered? Planet Propellant has submitted a picture, I believe, as part of the record. However, that picture cannot take in that that was a picture used during the criminal prosecution of the shooter not available to the base security guards as the vehicles were leaving the base. In context, Your Honor, we're looking at a period of approximately an hour where 600 vehicles are leaving the base. It's common to hear comments from vehicles as they leave. This entire encounter whereby a voice from a vehicle said, I'm going to do a 187 took between 5 and 20 seconds. Again, there was no identification of the people, the intended victim. Moreover, as Your Honor has pointed out, the... Well, did the guard that was posted there hear the comment about, I'm going to do a 187? The two security guards who were directing... Yes, Your Honor. The two security guards who were directing traffic off the base did hear this comment and then the vehicle left the base. What did they do then? They looked at each other. They put their hands on the weapon briefly because they were concerned about officer safety. At the same time, they are hearing this comment in the context of other comments such as look at you, Reddacuffs, or the, again, drunken comments. The primary mission at this point is to direct traffic safely off the base because you have such a high volume. Get them off the base. There's no evidence that they were specifically drunk. They were yelling and all that. That's common at parties or following parties. There are shows of bravado, men trying to impress their girlfriends. Those are often situations that the base security sees, particularly on a club night where you have a party. Again, putting these things into context, there's no warning that there's going to be a later shooting. In fact, the vehicle proceeds off base and it goes off base to an apartment to retrieve a weapon. Then it goes off base to a second location, that is the Del Taco restaurant that is several blocks away from the base. It's not visible from where the guards stand. There are any number of locations that the vehicles could have proceeded to. There was no way for the base security guards to know exactly where this vehicle was going, who they were going after once they left the base. So any 911 call to the force or the Navy allows these people to go into the Metro Club and just get heavily intoxicated and carry on in a loud manner and just go on all the time there? Well, Your Honor, no. The Navy, MWR, conducts certain events for service members, one of which was a club night. There are different types of club nights with different types of music. There is country western music. There is rock and roll music. This was hip-hop music on this particular evening. It is not uncommon for service members to consume alcohol at social events. If things get out of hand, if there is something serious, if there's a brandishing of a weapon, for example, then those members are automatically detained, arrested, and they will be sent back to their command where they will be processed. But if we look at the situation, there was no weapon. There was no specific threat of violence. There was no ongoing violence. Well, there was a specific threat. I'm going to do a 187, so I think you had this specific threat. You didn't know who it was against, but there was a specific threat. Well, respectfully, Your Honor, as we said, even if you look at that comment in the White Most Valuable at best, we're saying, I'm going to kill somebody. If we look at the applicable state appellate decisions on this, the Alvarez case, which is a case similar to the case that we have here, that was a restaurant case where people were involved in an ongoing fight in the parking lot in full view of the restaurant employees. After the fight was broken up, one group said, I'll be back. I'm going to get you, those type of comments. Well, now we have a little bit more because we know who is saying it. We know who the intended target is. We know where they're going to go. Then they eventually left. They actually came back with a weapon and then murdered someone execution style. The court in that case said it is a quantum leap to jump from a fist fight or comments into an execution style murder. Fist fights don't automatically mean that someone is going to pull out a firearm and kill someone execution style. That was the problem. The only people, when they get into arguments or even scuffles, that doesn't lead to gun violence. Not when you get sailors and Marines together. I'm sorry, ma'am? I said not when you get sailors and Marines together. Well, hopefully not, Your Honors, but the applicable law is, of course, the state law, which... Yeah. Yeah. It's... I know it's an interesting matter. They don't take pictures of these cars when they enter the base? Typically, when... No, Your Honor, typically they do not. The entry control onto the vehicle is not a question of fact. Well, isn't that a question of fact? I'm sorry, Your Honor? Isn't that a question of fact?  No, Your Honor. No, Your Honor. No, no. Well, there was testimony to that fact. I don't believe it was actually presented in the record. It was never really an issue below what the threat level was. We're talking about terrorist threats or national security type of threats that would be imposed upon every military installation across the country. There was some questions asked of the military centuries because they have a meeting before they go on duty and they were viewing such as the threat level. If this was not submitted in the record, as I recall, however, there was testimony that that night was not any particular elevated threat level. They were merely instructed to watch for ongoing traffic, incoming traffic, the fact that there was a club night, the fact that there may be other activities going on that night as well. I think we've got the picture. Yeah. Is that base still operating? It is, Your Honor. 32nd Street Naval Base is one of the largest bases in the Navy region southwest. There are any number of naval vessels there at any time. I don't have the numbers offhand. I believe it's over 100,000 military families living in San Diego, many of which are stationed at 32nd Street Naval Base. I would just close by stating, Your Honor, that should liability be found here, that there should be a duty, and putting aside even the question of causation issue, that the court would be imposing a very difficult duty upon the base that, given a very vague comment with no weapon, no intended target, that people would still have a responsibility, law enforcement, security officers would still have a responsibility to not only investigate but perhaps to even stop or interpose themselves. It would be an obligation to carry it out for military bases all throughout the country. And this policy matter was something that was specifically considered by the California courts in cases such as Alvarez and Ann M. and Sharon P., cases that all discussed the possible expansion of duty in the face of very minimal warnings or the absence of prior similar incidents. Unless Your Honor has any further questions. Thank you, Your Honor. There's one statement the counsel made about the record that I just have to respond to, Your Honor. Both of the guards testified that they felt it was their duty to call 911. Officer Salazar said he thought Officer Gordon had called 911. Their supervisor, Pedro Lopez, I believe is his name, says their intent to call 911 was correct. That was their duty under their mandatory regulations and they didn't do it. Their own expert testified that they should have called 911. So it's not something that was vague in their mind. They knew what they were supposed to do. They just didn't do it. Now, we're not getting into anything beyond negligence here. I don't make any allegation that they intentionally didn't do it. They just didn't. And as far as viewing the facts most favorable to the persons who have not prevailed on summary judgment, the argument about this base knowing about these incidents, again, that's not the facts. The facts are that Hip Hop Night was essentially fight night. If you look at the testimony on almost every Hip Hop Night, there is some kind of a fight. And they testified that they knew about 50 of them, 30 of them resulting in arrest. This is more than the few that the California Supreme Court in Delgado said wasn't enough for heightened foreseeability. Heightened foreseeability existed in this case. That's why they had the guards. Did this case ever go to trial? It did not. This is a summary judgment case. It was thrown out on the issue of duty. And again, he's correct in representing what the lower court did about how it came to the conclusion that there was no duty. But as I've argued in the briefs, that is the incorrect analysis. Because it's not the method of harmlessness. It's the fact that harm might occur. And that was evident in the facts most viewed most favorably to the plaintiffs, to the security personnel. And the minimal duties like calling 911, following the death of a loved one, calling 911. These are things the California Supreme Court has said even under regular foreseeability in a bar situation, you do this. So a duty exists under the facts as I believe I've presented them. And I request that you find one. Thank you. Denise B. Edwards versus.
judges: Fletcher B. , Pregerson, Graber